UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| KESIENA DENNIS OBIENU | CIVIL ACTION |
| VERSUS | NO. 25-1028 |
| ARCHDIOCESE OF NEW ORLEANS, *et al.* | SECTION M (2) |

### ORDER & REASONS

Before the Court is a motion for summary judgment filed by defendants The Roman Catholic Church of the Archdiocese of New Orleans ("ANO"), erroneously named as "Archdiocese of New Orleans"; Fr. Colm Cahill, erroneously named as "Father Colm Cahil"; and Fr. Dan Darmanin, erroneously named as "Father Dan Damani" (collectively, "Defendants").[1] Plaintiff Kesiena Dennis Obienu responds in opposition,[2] and Defendants reply in further support of their motion.[3] Having considered the parties' memoranda, the record, and the applicable law, the Court issues this Order & Reasons granting the motion because Obienu's Title VII claims are barred by the ministerial exception, a component of the church autonomy doctrine.

**I.   BACKGROUND**

This case concerns claims of discrimination and defamation. Obienu, a United States citizen of Nigerian origin, moved to New Orleans in 2017 to pursue a Master of Arts degree in theological studies at the Notre Dame Seminary to prepare for the priesthood.[4] Obienu alleges that he began experiencing discrimination in June 2019, when Fr. Cahill ignored his request for assistance in purchasing a new car after his old one broke down and Obienu still decided to buy a

---

[1] R. Doc. 28.
[2] R. Doc. 31.
[3] R. Doc. 34.
[4] R. Doc. 1 at 2, 8-9.

used 2019 Buick Encore for himself.[5] Obienu alleges that, when Fr. Cahill found out about the vehicle purchase, he "called [Obienu] and spoke to him in a demeaning way, [and] questioned the source of his downpayment and insisted that [Obienu] sell his car."[6] After Obienu sold the newly acquired car, Fr. Cahill refused to help him reclaim his old car, which was in the possession of the ANO's vocations office; he threatened Obienu with retaliation for seeking help from the previous ANO vocations director; and he summoned Obienu to face a disciplinary panel, which included Archbishop Gregory Aymond, to question Obienu about the source of his funds to purchase the car.[7] According to Obienu, other seminarians had similar or newer cars and were not subjected to such treatment.[8]

Obienu alleges that "the abuse" continued when he refused to continue mental health treatment after one visit.[9] He alleges a laundry list of complaints against Fr. Cahill, including: that in January 2021, Fr. Cahill failed to reinstate Obienu's medical insurance "all the while showing his disdain for [Obienu]"; that Fr. Cahill told Obienu he should not hope for priestly ordination; and that Fr. Cahill caused Obienu to be "*laicized*, and seek a new diocese where he would *excardinate*."[10]

According to Obienu, Archbishop Aymond refused his request to leave the ANO.[11] Obienu was then ordained as a priest "against his express wishes," and, in July 2022, he was assigned to St. Margaret Mary Church in Slidell, Louisiana, where he experienced more discrimination by Fr. Darmanin.[12] Obienu claims that Fr. Darmanin told him not to leave any leftovers in the refrigerator

---

[5] *Id.* at 9. The facts from the complaint recounted here are taken to be true at this motion-to-dismiss stage.
[6] *Id.* at 9-10.
[7] *Id.* at 10.
[8] *Id.* at 10-11.
[9] *Id.* at 11.
[10] *Id.* (emphasis in original).
[11] *Id.*
[12] *Id.*

2

so it would not smell.[13]  Also, Obienu alleges that his weekly stipend was $20 less than it should have been, the ANO did not pay his phone bill as it did for other priests, he was refused reimbursement for continuing education, he was not permitted to be a co-signer on parish accounts as were his predecessors, and the parish staff refused to follow his instructions.[14]  Obienu says that he was subjected to a "retaliatory investigation and then removed from the parish" when he complained about the treatment he received.[15]

Then, in January 2023, Archbishop Aymond assigned Obienu to work part-time, without a specific job description, at two nursing homes and denied him the ability to stay in a rectory, which forced him to live in a senior-living apartment for six months without a food allowance.[16]  According to Obienu, the nursing home assignment was "the result of him being terminated by [the ANO] without notice to him."[17]  Obienu contends that he learned of the termination in August 2023, when he was reassigned to the Immaculate Conception Church in Marrero, Louisiana, to work part-time and accidentally discovered that his 401(k) retirement account had been terminated by the ANO.[18]  On April 24, 2024, Obienu received a letter advising him that he was under investigation for impersonating a chaplain.[19]  He believes that the letter resulted from his complaining about the nursing-home posting and other issues related to his "undisclosed" termination.[20]  Obienu then took a leave of absence.[21]

---

[13] *Id.*
[14] *Id.* at 11-12.
[15] *Id.* at 12.
[16] *Id.*
[17] *Id.*
[18] *Id.* at 12-13.
[19] *Id.* at 13.
[20] *Id.*
[21] *Id.*

Obienu filed this suit on May 22, 2205.[22] He brings federal and state-law employment discrimination claims against the ANO for wrongful termination, failure to promote, failure to allow him to complete the training necessary for promotion, unequal terms and conditions of employment, and retaliation.[23] Obienu had also asserted Louisiana state-law claims against all Defendants for libel and slander (defamation), civil conspiracy, negligence, and intentional and negligent infliction of emotional distress.[24] Upon Defendants' motion, the state-law tort claims were all dismissed with prejudice as prescribed.[25]

**II.    PENDING MOTION**

Defendants move for summary judgment on Obienu's employment discrimination claims.[26] Citing *McRaney v. North American Mission Board of the Southern Baptist Convention, Inc.*, 157 F.4th 627 (5th Cir. 2025); *Serbian Eastern Orthodox Diocese for the United States of America and Canada v. Milivojevich*, 426 U.S. 696 (1976); *Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. 732 (2020); *Hosanna-Tabor Evangelical Lutheran Church and School v. Equal Employment Opportunity Commission*, 565 U.S. 171 (2012); and *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir. 1972), Defendants argue that the ministerial exception of the church autonomy doctrine bars secular courts from adjudicating the employment discrimination claims of ministers against religious organizations.[27] They contend that the protection, which arises under the First Amendment's Religion Clause, constitutes a complete immunity from suit.[28] To that end,

---

[22] *Id.* at 1-27.
[23] *Id.* at 15-16.
[24] *Id.* at 16-24.
[25] R. Doc. 22 (citing R. Doc. 14). Obienu filed a notice of appeal related to the Order & Reasons granting Defendants' motion to dismiss. R. Doc. 25. However, because that order was interlocutory and nonappealable, this Court is not divested of jurisdiction and is thus able to address the remaining claims. *See Butler v. Denka Performance Elastomer LLC*, 806 F. App'x 271, 275 n. 5 (5th Cir. 2020).
[26] R. Doc. 28.
[27] R. Doc. 28-1 at 4-5, 7-13.
[28] *Id.* at 4.

4

Defendants argue that Obienu's employment discrimination claims are barred because "this lawsuit arises out of a disgruntled former priest's dissatisfaction with how [the ANO] managed his role as a minister within its system of religious governance."[29] They point out that, at all times relevant to this litigation, Obienu was minister "as he was employed in extensive training to become a Roman Catholic priest or serving as an ordained Roman Catholic Priest throughout the entirety of the events giving rise to this action."[30] Defendants also highlight that Fr. Cahill and Fr. Darmanin are "employees, managers, officers, and/or directors of the [ANO]," who in their capacity as "ministers serving within the hierarchal structure of the church" are alleged to have taken various adverse employment actions against Obienu.[31] For these reasons, say Defendants, it "would constitute an impermissible entanglement in violation of the First Amendment" for this Court to consider the employment discrimination "claims raised by Obienu, a Roman Catholic priest, regarding his employment with the Roman Catholic Church of the [ANO]."[32]

In opposition, Obienu argues that the ministerial exception is "a narrow doctrine" that applies only when the plaintiff is performing the duties of a minister in "functional reality," regardless of title, and that its application requires "a fact-intensive inquiry considering the total circumstances surrounding the employee's work."[33] He contends that summary judgment is not warranted because there are factual disputes whether "the adverse employment actions at issue stemmed not from religious doctrine but from national-origin discrimination, disparate treatment, and retaliation after reporting mistreatment."[34] According to Obienu, the ministerial exception is not a categorical immunity from judicial scrutiny, but rather it allows for claims "grounded in

---

[29] *Id.*
[30] *Id.* at 8, 12 (quote at 8).
[31] *Id.* at 10-11.
[32] *Id.* at 12.
[33] R. Doc. 31 at 1, 7-8 (quote at 1).
[34] *Id.* at 2, 9-10 (quote at 2).

5

secular workplace discrimination [to] remain adjudicable through neutral principles of law."[35] And Obienu insists that Defendants have not met their burden of demonstrating that the ministerial exception applies here because, he says, there are disputed issue of material fact regarding whether his "duties were predominantly religious and that the challenged conduct was ecclesiastical in nature."[36] Obienu argues that *McRaney* and *Milivojevich* are inapposite because those cases did not involve Title VII claims and did not consider whether neutral legal principles could be applied to assess secular workplace conduct.[37] He also contends that *Hosanna-Tabor* and *Our Lady of Guadalupe* do not justify summary judgment because those cases did not "create[] a categorial rule shielding all employment decisions by religious institutions" from judicial scrutiny.[38] According to Obienu, the church autonomy doctrine does not apply because none of his claims call for the interpretation of church doctrine or ecclesiastical judgment, but rather, turn on the secular matters of motive, comparative treatment, and the sequence of events.[39]

Defendants reply, reurging that the ministerial exception bars Obienu's employment discrimination claims because at all relevant times he was a minister of the ANO.[40] They argue that Obienu cannot plausibly argue that he was not a minister when he was in training to be, or was, a priest.[41] Further, Defendants emphasize that all of Obienu's employment discrimination claims hinge on a comparison of his treatment by the ANO with its treatment of other ministers, so that any adjudication of such claims would require the court to intrude impermissibly into the church's management practices.[42] Defendants also contend that all of Obienu's duties as an

---

[35] *Id.*
[36] *Id.* at 8.
[37] *Id.* at 8-9.
[38] *Id.* at 9.
[39] *Id.* at 9-10.
[40] R. Doc. 34 at 1-8.
[41] *Id.* at 1-4.
[42] *Id.* at 4.

ordained priest place him squarely within the ministerial exception which, under *McRaney* and *Hosanna-Tabor*, "bars the application of even neutral, generally applicable employment discrimination statutes" like Title VII.[43]

## III. LAW & ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *Id*. at 323. If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id*. at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law identifies which facts are material. *Id*. Material facts are not genuinely disputed when a rational trier of fact could not find for the nonmoving party upon a review of the record taken as a whole. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *EEOC*

---

[43] *Id.* at 7 (first quoting *McRaney*, 157 F.4th at 637, and then discussing the holding in *Hosanna-Tabor*, 565 U.S. at 196).

*v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014). Unsubstantiated assertions, conclusory allegations, and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 249-50; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994); *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994). In ruling on a summary-judgment motion, a court may not resolve credibility issues or weigh evidence. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001). Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

After the movant demonstrates the absence of a genuine issue of material fact, the nonmovant must articulate specific facts showing a genuine issue and point to supporting, competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A), (c)(2). Such facts must create more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary-judgment burden. *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(1)(B). Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075-76.

### B. The Ministerial Exception

Just two months ago the Fifth Circuit in *McRaney* outlined the First Amendment's church autonomy doctrine, explaining its history and breadth of application. 157 F.4th at 633-47. The court began by observing that "[c]ivil courts cannot adjudicate ecclesiastical matters." It then explained that "[t]he First Amendment's Religion Clause enshrines that principle within the church autonomy doctrine, which shields religious institutions from interference by state and federal courts." *Id.* at 633-34 (citing *Our Lady of Guadalupe*, 591 U.S. at 746). To that end, "[t]he 'general principle of church autonomy' guarantees to religious institutions 'independence in matters of faith and doctrine and in closely linked matters of internal government.'" *Id.* at 635 (quoting *Our Lady of Guadalupe*, 591 U.S. at 747). While the doctrine "safeguard[s] religious institutions' 'autonomy with respect to internal management decisions that are essential to the institution's central mission,'" it "does not grant 'religious institutions a general immunity from secular laws." *Id.* at 635-36 (alteration omitted) (quoting *Our Lady of Guadalupe*, 591 U.S. at 746). However, where it applies, the church autonomy doctrine is a "constitutional immunity from suit" that "must be resolved at the threshold of litigation." *Id.* at 641.

The so-called ministerial exception is a "'component' of the church autonomy doctrine." *Id.* at 636 (quoting *Our Lady of Guadalupe*, 591 U.S. at 746). It is a rule that "commands courts 'to stay out of employment disputes involving those holding certain important positions within churches and other religious institutions.'" *Id.* (quoting *Our Lady of Guadalupe*, 591 U.S. at 746). The "ministerial exception" applies to persons holding the title of "minister" and also to other employees "'who lead[] a religious organization, conduct[] worship services or important religious ceremonies or rituals, or serve[] as a messenger or teacher of its faith.'" *Id.* at 637 (emphasis omitted) (quoting *Our Lady of Guadalupe*, 591 U.S. at 754). Because the doctrine is intended to

9

"ensure[] that the authority to select and control who will minister to the faithful – a matter strictly ecclesiastical – is the church's alone," the doctrine applies even if the church's decision to fire a minister was not made for religious reasons. *Id.* (quoting *Hosanna-Tabor*, 565 U.S. at 194-95); *see also Alicea-Hernandez v. Cath. Bishop of Chi.*, 320 F.3d 698, 703 (7th Cir. 2003) (stating that it is not the court's "role to determine whether the Church had a secular or religious reason for the alleged mistreatment of [plaintiff]" because "[t]he 'ministerial exception' applies without regard to the type of claims being brought").

With this backdrop, the Fifth Circuit explicitly stated in *McRaney* that "[t]he ministerial exception bars the application of even neutral, generally applicable employment discrimination statutes – such as … Title VII." 157 F.4th at 637 (citing *Hosanna-Tabor*, 565 U.S. at 180; *Our Lady of Guadalupe*, 591 U.S. at 760). And the ministerial exception also bars state-law claims that "litigate the employment relationship between the religious organization and the employee." *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 945 (7th Cir. 2022)). The *McRaney* court cites numerous cases as examples of when "[c]ourts have rejected a wide variety of torts that attack ministry staffing decisions, including wrongful termination, breach of contract, tortious interference, intentional infliction of emotional distress, defamation, conspiracy to commit defamation, negligent supervision and detention, and retaliation." 157 F.4th at 637 (collecting cases).

Any factual distinctions between *McRaney*, along with the other cases cited by Defendants, and the case at bar are immaterial in the wake of the Fifth Circuit's emphatic declaration concerning the ministerial exception's application to employment-related claims. Indeed, as early as 1972, the Fifth Circuit in *McClure* recognized that applying Title VII to an employment relationship between a church and one of its ministers "would result in an encroachment by the

10

State into an area of religious freedom which it is forbidden to enter by the principles of the free exercise clause of the First Amendment." 460 F.2d at 560. In so holding, the court noted that, not only is the selection of ministers exempt from Title VII's purview, so are "the determinations of a minister's salary, his place of assignment, and the duty he is to perform in furtherance of the religious mission of the church." *Id.* at 559. Four years later, in *Miliojevich*, the Supreme Court held that the Free Exercise Clause forbids secular courts from reviewing a church's procedures affecting employment decisions related to its clergy because those decisions in and of themselves are ecclesiastical. 426 U.S. at 712-14, 724-25.

The Eighth Circuit's decision in *Scharon v. St. Luke's Episcopal Presbyterian Hospitals*, 929 F.2d 360 (8th Cir. 1991), is instructive here. In that case, a dismissed minister brought Title VII and other employment-related claims against the religious institution, alleging that the religious reasons the defendant gave as the basis for her termination were a pretext for discrimination. *Id.* at 363. In applying the ministerial exception to uphold the dismissal of the claims, the court stated: "To allow [plaintiff's] case to continue would necessarily lead to the kind of inquiry into religious matters that the First Amendment forbids." *Id.* The court reasoned that "[p]ersonnel decisions by church-affiliated institutions affecting clergy are *per se* religious matters and cannot be reviewed by civil courts, for to review such decisions would require the courts to determine the meaning of religious doctrine and canonical law and to impose a secular court's view of whether in the context of the particular case religious doctrine and canonical law support the decision the church authorities have made," which "is precisely the kind of judicial second-guessing of decision-making by religious organizations that the Free Exercise Clause forbids." *Id.*

With the Fifth Circuit's broad pronouncement in *McRaney* – based on a thorough historical and legal analysis – that the ministerial exception bars secular courts from considering Title VII

11

and related state-law employment claims brought by a minister against a religious organization, this Court is bound to conclude that Obienu's remaining employment discrimination claims against Defendants must be dismissed. It is undisputed that Obienu was, at all relevant times, either a Roman Catholic priest or training to be one. All the incidents he alleges constitute "employment discrimination" arose while he was training or working under the auspices of the ANO either as a seminarian or as an ordained priest.[44] Further, the persons who he says acted unlawfully were themselves ordained priests or the archbishop. This is not a case where a peripheral church employee may or may not be categorized as a "minister" depending on whether he or she was a teacher of the faith. *See, e.g.*, *Alicea-Hernandez*, 320 F.3d at 703-04 (ultimately applying that ministerial exception to bar Title VII claims brought by a church's communications manager because she "was integral in shaping the message that the Church presented to the Hispanic community"). Instead, Obienu, as a Roman Catholic priest or priest-in-training, was a minister charged with leading a religious organization in the various ways assigned and serving as a messenger of its faith. There can be no doubt, then, that the ministerial exception applies here to shield the church's employment decisions from secular scrutiny or interference. *See McRaney*, 157 F.4th at 653 (observing that courts "'are bound to stay out of employment disputes' involving ministers and ecclesiastical organizations" (quoting *Our Lady of Guadalupe*, 591 U.S. at 746)); *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985) (noting that the "introduction of government standards [in]to the selection of spiritual leaders would significantly, and perniciously, rearrange the relationship between church and state"). Accordingly, Defendants' motion must be granted.

---

[44] *See generally* R. Doc. 1.

## IV. CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that Defendants' motion for summary judgment (R. Doc. 28) is GRANTED, and Obienu's remaining employment discrimination claims are DISMISSED WITH PREJUDICE.

New Orleans, Louisiana, this 11th day of December, 2025.

BARRY W. ASHE
UNITED STATES DISTRICT JUDGE